```
                    UNITED STATES DISTRICT COURT
                    EASTERN DISTRICT OF MISSOURI
                          EASTERN DIVISION


UNITED STATES OF AMERICA,       )
                                )
            Plaintiff,          )
                                )
     v.                         )    No. S1-4:07 CR 295 HEA
                                )                        DDN
JON REID,                       )
                                )
            Defendant.          )
```

**REPORT AND RECOMMENDATION**
**OF UNITED STATES MAGISTRATE JUDGE**

This action is before the court upon the pretrial motions of the parties which were referred to the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(b). An evidentiary hearing was held on October 16, 2007.

Defendant Jon Reid has moved to suppress the statements he made on October 17 and 18, 2006. (Doc. 33.) From the evidence adduced at the hearing, the undersigned makes the following findings of fact and conclusions of law:

### FACTS

October 17, 2006

1. During and for several months before October 2006, United States Postal Inspector Matthew Villicana and Lake County, Indiana, Sheriff's Office Detective Pat Tracey were conducting parallel investigations of Jon Reid and his company, Atlantic Corp.,[1] for fraud. During the morning hours of October 17, 2006, they and Police Detective Robert Bridgeman went to Reid's home in Crown Point, Indiana, to interview him. Before this date, Inspector Villicana had collected documents and interviewed witnesses but not any employee of Atlantic Corp.

---

[1] Jon Reid was the sole shareholder and owner and officer of Atlantic Corp.

2. Inspector Villicana and Detectives Tracey and Bridgeman arrived in Crown Point, a gated residential community, at approximately 8:30 a.m. Detective Tracey pointed out Reid's house, which Reid was renting from Bruce Rivera. They went up to and knocked on the front door. The front door was opened by Brian Jones, a friend of Reid and someone Det. Tracey had met before. The officers identified themselves as law enforcement and explained that they wanted to interview Reid.[2] Inspector Villicana knew that Jones was a local law enforcement officer.[3] Jones invited the officers into the house, explained that Reid was not at home, but offered to call him.[4] Inspector Villicana asked him to do so. Jones called Reid and told him there was a postal inspector and some detectives who needed to talk to him and that he should come over to the house. Jones did not command Reid to come and the phone call took only a very short period of time. After completing the call, Jones stated that Reid was on his way. Jones told the officer that he and Reid were friends, and that he was living temporarily with Reid for free until the repairs on his own condominium were finished.[5]

3. Inside the front door of Reid's residence was a small entryway. Immediately to right of the entryway was an open space, not separated by a wall or door. Reid had made an office in this space which was near the front window. The officers stood in this office space while they waited for Reid to arrive. Villicana had some documents with him at the time.

---

[2]The officers had neither an arrest warrant for Reid nor a search warrant for the residence.

[3]No evidence indicated that Jones was involved in the law enforcement investigation of Reid.

[4]Reid's children and wife, who was then separated from Reid, also were not at the residence at that time.

[5]When he made this telephone call, Jones was not acting in an official law enforcement capacity. Nevertheless, during the suppression hearing, Reid testified that he believed Jones was calling as a friend and as a police officer. He added that Jones sounded "pissed" on the phone.

4. Reid arrived approximately thirty minutes after Jones's telephone call. He entered through the front door. The officers identified themselves and said they wanted to interview him about his company and about himself. Villicana told Reid that he was not under arrest and would not be arrested at the interview's conclusion.[6] He told Reid that talking to the officers was entirely voluntary and that he did not have to answer questions if he did not want to. No officer made any threats to coerce Reid into participating in the interview.

5. Reid agreed to answer the officers' questions. The interview took place in the office space near the front door. In that area Inspector Villicana sat on the side of the desk facing the window. Reid sat in a chair close to the front window and the front door, across from Villicana. Detective Tracey sat to Reid's right, closest to the wall, and away from the front door. Officer Bridgeman stood by the staircase. Reid could easily have walked out of the interview area.[7] Before the interview began, at Villicana's request Jones went upstairs and did not participate in the interview. At some point during the interview, Bridgeman and Jones left the residence to get lunch. Inspector Villicana wore a business suit. All three investigators were armed, but none drew or expressly displayed his firearm to Reid.

6. During the interview, Inspector Villicana did not notice in Reid any mental or physical condition that would make an interview inappropriate. He did not smell alcohol on Reid's breath. Reid told the officers that he had watched the Bears football game the night before, he did not say he had been up all night drinking.[8] All of

---

[6]At the hearing Reid testified that Inspector Villicana waited until the end of the interview to state that he was not under arrest. Given the inspector's experience in law enforcement and training in observation, the undersigned credits the testimony of Inspector Villicana over that of Reid.

[7]At the hearing, Reid testified that Inspector Villicana directed him to sit in the corner and the Inspector sat at the head of the table with a large stack of papers not facing him. The undersigned credits the testimony of Inspector Villicana in this respect.

[8]Reid testified he had been drinking heavily the night before and had only slept for a half-hour before meeting the officers on October
(continued...)

Reid's responses were reasonable. Reid responded logically to the questions he was asked. He provided the specific amounts of money he owed certain individuals. Reid never stopped the officers to say he had a headache or any other condition. Early in the interview, Reid was asked about his relationship with Steve Cox of Cox Industrial Equipment in St. Louis. Reid stated that he had lied to Cox. Reid's eyes filled with tears and his face turned red. At one point during the interview, Inspector Villicana asked Reid if he was on medication and Reid asked whether the Inspector thought that because of his eyes. Villicana said that he just wanted to be sure Reid would be OK when the officers left.

    7. The interview lasted approximately two hours and was conversational, with Reid responding to the questions he was asked.[9] During the interview, no one suggested that Reid see a lawyer.

    8. Neither Reid nor Inspector Villicana left the room during the two-hour interview. During the interview, the phone rang several times, but Reid never answered the phone and never made any attempt to answer it.[10] During the interview, no one raised his voice or yelled at Reid. No doors were shut and no locks were locked in an effort to confine Reid. Reid was not handcuffed or searched. During the interview Reid was not advised of his <u>Miranda</u> warnings. At the end of the interview, Reid said he was glad the officers had finally come.[11]

---

[8](...continued)
17, 2006.

[9]Reid testified at the hearing that during the interview Inspector Villicana interrupted him and did not allow him to answer any of the questions completely. Reid testified that the interview was dominated by the Inspector.

[10]Reid testified that he did not try to answer the phone because he felt he would not have been able to.

[11]Reid testified that Inspector Villicana said he was not going to arrest him, but if Reid tried to leave town, he would have the U.S. Marshals find him.

9.  After the interview, Inspector Villicana left the residence to speak with Bruce Rivera outside the residence.[12]

10. Later that day, Reid made several phone calls to Det. Tracey.[13] During these conversations, Reid indicated he wanted to ask the officers some specific questions. As a result, arrangements were made for the three officers to return to Reid's residence to conduct another interview on October 18, 2006.

October 18, 2006

11. On October 18, 2006, Inspector Villicana and Det. Tracey arrived at Reid's residence for another interview. Reid was at home when the officers arrived and he invited them in. Villicana and Tracey told Reid he was not under arrest. They did not advise Reid of his <u>Miranda</u> rights. Reid's wife was present at this time and sat next to him. At the beginning of the interview, there was no conversation about obtaining a lawyer. Reid wanted to discuss topics that had been discussed during the interview the previous day. Inspector Villicana sat where Reid had sat the day before. Reid and his wife sat across from him. During the interview, Inspector Villicana stated that he believed Reid had taken money from multiple people for the same racks, not refunded the money to anyone, and made false statements about the whereabouts of the racks. Upon hearing this, Reid's face turned red, he lowered his head, and started shaking it back and forth. Asked to corroborate statements from the day before, Reid's eyes filled with tears and he did not answer the question.

12. The interview lasted approximately one hour. At the end of the interview, there was conversation about Reid obtaining the services

---

[12]Reid testified that Inspector Villicana left the interview to speak with Rivera. While Inspector Villicana was speaking with Rivera, Reid said Detective Tracey stood on his doorstep and directed him to "stay put."

[13]Reid testified that Det. Tracey said he would call Reid. When Tracey did not call, Reid called Tracey. When Tracey finally answered, he said that he was around the corner from Reid's residence and that he would be coming over. Inspector Villicana was with Tracey at the time; Reid testified that he was not expecting to see Inspector Villicana again.

of an attorney, which Inspector Villicana interpreted to mean that Reid might not be able to afford an attorney.[14]

13.  After this interview on October 18, 2006, Reid voluntarily relinquished one of his vehicles.

14.  The interview on October 18, 2006, was not recorded. Again, while Inspector Villicana and Detective Tracey were both armed during the interview, neither displayed his weapon to Reid. All of Reid's statements on October 18, 2006, were reasonable and there was no indication to the officers that Reid was impaired. Reid was not arrested at the conclusion of either interview.

## DISCUSSION

Reid argues that his statements to the investigators on October 17 and 18, 2006, should be suppressed because they were obtained in violation of his rights under the Fifth Amendment. The undersigned disagrees.

The Fifth Amendment to the Constitution protects an individual from being compelled to be a witness against himself. U.S. Const. amend. V. To safeguard an individual's Fifth Amendment rights, a suspect in custody must be warned, before being interrogated, that he has the right to remain silent and that any statement he makes may be used against him. Miranda v. Arizona, 384 U.S. 436, 444 (1966). In Miranda, the Supreme Court concluded that the inherently coercive nature of custodial interrogations blurred the line between voluntary and involuntary statements, heightening the risk that an individual would be deprived of the Fifth Amendment's protections. Dickerson v. United States, 530 U.S. 428, 435 (2000). The procedural safeguards described in Miranda apply to persons who are subjected to interrogation and who are in custody. Oregon v. Mathiason, 429 U.S. 492, 494-495 (1977) (per curiam). The simple fact that an investigation has focused on a particular suspect does not implicate Miranda if the settings are noncustodial. Minnesota v. Murphy, 465 U.S. 420, 431 (1984).

---

[14]Reid testified that he never asked about a lawyer. Instead, he said Inspector Villicana left a card and stated that if Reid could not afford a lawyer he could have one appointed.

- 6 -

An interrogation, under Miranda, includes not only express questioning, but any words or actions by law enforcement reasonably likely to elicit an incriminating response from the suspect. Rhode Island v. Innis, 446 U.S. 291, 301 (1980). An incriminating response is any response, be it inculpatory or exculpatory, that the prosecution might seek to introduce at trial. Id. at 301 n.5. In this case, the interviews with Reid were clearly interrogations.

An individual is in custody if he has been formally arrested or if his freedom of movement has been restricted to a degree associated with a formal arrest. California v. Beheler, 463 U.S. 1121, 1125 (1983). In determining the question of custody, the court first looks to the circumstances surrounding the interrogation. Thompson v. Keohane, 516 U.S. 99, 112 (1995). Given those circumstances, the court then asks whether a reasonable person would have felt at liberty to terminate the interrogation and leave. Id. The critical inquiry centers on whether the person's freedom to depart was restricted in any way. Mathiason, 429 U.S. at 495; United States v. LeBrun, 363 F.3d 715, 720 (8th Cir. 2004) (en banc). In making this inquiry, the court looks to the totality of the circumstances from an objective viewpoint, and not the subjective views of either the suspect or the officers. Stansbury v. California, 511 U.S. 318, 322-23 (1994); LeBrun, 363 F.3d at 720.

The Eighth Circuit has developed a series of factors to help determine when an individual is in custody. United States v. Griffin, 922 F.2d 1343, 1349 (8th Cir. 1990). These factors include: (1) whether the officer informed the suspect that the questioning was voluntary and the suspect was free to leave; (2) whether the suspect's freedom of movement was restrained during the questioning; (3) whether the suspect initiated contact with the authorities, or simply agreed to answer questions; (4) whether the officers employed strong-arm tactics or deceptive tactics during the questioning; (5) whether the atmosphere of the questioning was police-dominated; and (6) whether the officers placed the suspect under arrest at the end of the questioning. Id. These six factors are intended to be representative, rather than exclusive. United States v. Axsom, 289 F.3d 496, 501 (8th Cir. 2002). There is no requirement "that the Griffin analysis be followed

ritualistically in every Miranda case." United States v. Czichray, 378 F.3d 822, 827 (8th Cir. 2004). Indeed, in LeBrun, the Eighth Circuit decided, en banc, a custody question without ever mentioning Griffin. Id. Whether the six factors are consulted or not, the "ultimate inquiry must always be whether the defendant was restrained as though he were under formal arrest." Id. at 828.

The undersigned concludes that the Griffin factors are relevant to the facts before the court.

**Statements of October 17, 2006**

When the officers arrived at Reid's home on October 17, 2006, they identified themselves as law enforcement and explained to Jones that they wanted to interview Reid. When Reid arrived, the officers again identified themselves as law enforcement, and explained that they needed to interview him and ask him about his company. Inspector Villicana explained that Reid was not under arrest and would not be arrested at the interview's conclusion. Villicana also explained that speaking to the officers was entirely voluntary and Reid did not have to answer questions if he did not want to. Looking to the first Griffin factor, Reid was not in custody at the time of the first interview. See Griffin, 922 F.2d at 1349 ("The most obvious and effective means of demonstrating that a suspect has not been taken into custody . . . is for the police to inform the suspect that an arrest is not being made and that the suspect may terminate the interview at will.")

The second factor also supports finding Reid was not in custody during the first interview. When the officers sat down to interview Reid, Inspector Villicana made a point of sitting across from the defendant, allowing him an area from which he could leave the interview area. The office in which the interview took place was immediately accessible to the hallway and the front door, and was not separated by any wall or door. In addition, Reid drove himself to his home, unaccompanied by law enforcement officers, knowing that law enforcement officers wanted to speak with him. See United States v. Wolk, 337 F.3d 997, 1006 (8th Cir. 2003) (finding defendant was not in custody when he drove himself to his residence, where officers were waiting to execute

a search warrant).  Finally the officers did not search or handcuff Reid.

At the hearing, Reid testified that the telephone rang several times during the interview, but felt pressure not to answer it.  This does not in and of itself indicate a custodial setting.  See United States v. Sutera, 933 F.2d 641, 647 (8th Cir. 1991); see United States v. Helmel, 769 F.2d 1306, 1320 (8th Cir. 1985).

In Sutera, officers instructed the defendant not to answer the telephone while they interviewed him and searched his home.  Sutera, 933 F.2d at 647.  The interview lasted close to an hour and the search lasted three and a half hours.  Id.  Yet, the court found the record "devoid of any evidence" to show the officer's conduct placed the defendant in custody.  Id.  In Helmel, the FBI Agent answered all of the incoming calls while the defendant was interviewed and his residence searched.  Helmel, 769 F.2d at 1320.  The questioning lasted somewhere between forty-five minutes and two hours.  Id.  Again, the court did not find the agent's actions created a coercive atmosphere.  Id.

In this case, the officers never answered Reid's phone or instructed him not to answer his phone.  And even assuming a reasonable person would not have felt free to use the phone, "placing certain ground rules on an interview does not preclude a reasonable person from foregoing the interview altogether."  Czichray, 378 F.3d at 828.  Discouraging a suspect "from using a telephone in his home during an interview often is not probative of whether he is free to terminate the interview altogether."  Id.  The second Griffin factor also indicates Reid was not in custody during the first interview.

The third factor supports Reid since he did not initiate contact with the officers on the first day.

The fourth factor supports finding Reid was not in custody when he was interviewed.  The officers did not employ any strong-arm or coercive tactics during the interview.  Villicana testified that the interview was conversational and that Reid answered all of the questions logically.  Reid did not appear to be suffering from sleep-deprivation or under the influence of alcohol during the questioning.  Finally, the interview lasted approximately two hours, not a period of time

sufficiently long to overcome the will of the defendant.  See Czichray, 378 F.3d at 825 (despite nearly seven-hour interview, beginning at 6:30 a.m., defendant was not in custody).

The fifth Griffin factor supports finding Reid was not in custody. In this case, Reid was seated next to two officers, while another stood in the hallway.  Between the two seated officers, Reid personally knew, and was friendly with, Detective Tracey.  See Griffin, 922 F.2d at 1354 (noting officers diminish the public character of an interview, and establish their dominion over an interview, by removing family, friends, or colleagues, who might lend moral support, from the interview environment).  In addition, the interview occurred at Reid's residence. "When a person is questioned 'on his own turf,' [courts] have observed repeatedly that the surroundings are not indicative of the type of inherently coercive setting that normally accompanies a custodial interrogation."  Czichray, 378 F.3d at 826; see also United States v. Axsom, 289 F.3d 496, 502 (8th Cir. 2002) ("When a suspect is interrogated in the comfort and familiarity of his home, a court is less likely to find the circumstances custodial.")

Since the officers did not place Reid under arrest at the end of the interview, the sixth Griffin factor supports finding Reid was not in custody.  See United States v. Galceran, 301 F.3d 927, 931 (8th Cir. 2002) (the absence of an arrest is a very important factor weighing against custody).

In light of the six Griffin factors, it seems clear that Reid was not restrained as though he were under formal arrest during the interview on October 17, 2006.  Since Reid was not in custody, the requirement that he be advised of his Miranda rights did not attach during the interview of October 17, 2006, and his statements may be used against him at trial.

**Statements on October 18, 2006**

The circumstances of the interview on October 18, 2006, are even less favorable to finding Reid was in custody.  The officers arrived to interview Reid on October 18, 2006, at Reid's request for an opportunity to ask questions about the investigation.  Inspector Villicana told Reid

he was free to leave the interview. The two officers also advised Reid that he was not under arrest. The second interview was conducted without Officer Bridgeman, lasted only an hour, and was conducted in the presence of Reid's wife. Finally, Reid was not arrested at the end of the interview on October 18, 2006. Only the seating arrangements of the second day lend support to Reid's assertion that he was in custody during the interview. During the second day, Inspector Villicana exchanged places with Reid, but this did not create a custodial situation. Looking to the six Griffin factors, Reid was not in custody during the interview of October 18, 2006. Since Reid was not in custody, the protections of Miranda did not attach and his statements may be used against him at trial.

**Voluntary Statements**

During the suppression hearing, Reid appeared to argue that his statements on October 17, 2006, were involuntary because of his sleep-deprivation and heavy-drinking from the night before.

A statement is involuntary when it was induced by the interrogating officers by threats, violence, or express or implied promises sufficient to overcome the defendant's will and critically impair his capacity for self-determination. LeBrun, 363 F.3d at 724. Whether a confession is involuntary is judged by the totality of the circumstances, but with a focus on the conduct of the officers and the characteristics of the accused. Id. The government bears the burden of proving the challenged statements were voluntary by a preponderance of the evidence. Id.

In this case, during neither interview did the officers threaten or yell at Reid, either before or during the interviews. The officers never drew their weapons and did not make any false promises to Reid. Inspector Villicana testified that Reid answered all of the questions reasonably and logically, and could remember the specific amounts he owed different individuals. Inspector Villicana did not notice the smell of alcohol on Reid's breath, and Reid never indicated he was too tired or ill to continue with either interview. Under the circumstances, it seems clear Reid's statements were voluntary.

Whereupon,

**IT IS HEREBY RECOMMENDED** that the motion of defendant to suppress statements (Doc. 33) be denied.

The parties are advised they have until November 30, 2007, to file written objections to this Report and Recommendation. The failure to file timely objections may result in a waiver of the right to appeal issues of fact.


    /S/ David D. Noce
**UNITED STATES MAGISTRATE JUDGE**


Signed on November 15, 2007.